```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| CHARLES FREEMAN, | : | CIVIL ACTION |
| | : | NO. 19-04333 |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| MARK CAPOZZA, et al., | : | |
| | : | |
| Respondents. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                      February 8, 2021

**I. INTRODUCTION**

Pro se Petitioner Charles Freeman was convicted by a jury in the Montgomery County Court of Common Pleas of second-degree murder, robbery, kidnapping, conspiracy to commit kidnapping, and conspiracy to commit robbery. Freeman was sentenced to life imprisonment. Freeman now brings a § 2254 habeas petition raising six claims: two ineffective assistance of counsel claims, one Brady claim, one Bruton claim, one Fourth Amendment claim, and a claim that the trial court violated his constitutional rights by denying his motion in limine. Magistrate Judge Heffley issued a report and recommendation that the petition be denied because, while Judge Heffley found that a Bruton violation occurred during trial, the violation was harmless error.

Freeman raises seven objections to the Report and Recommendation. This court applies de novo review to the portions of the Report and Recommendation to which Freeman objects. 28 U.S.C. § 636(b)(1). The Court agrees with Judge Heffley that a <u>Bruton</u> violation occurred, but disagrees that it was harmless error. For this reason, Freeman's habeas petition will be granted.

**II. FACTUAL BACKGROUND/PROCEDURAL POSTURE**

The facts underlying Freeman's conviction are laid out in detail in Judge Heffley's thorough Report and Recommendation and the Court need not recount all of them here. <u>See</u> R. & R. 1-4, ECF No. 37.

In summary, the other individuals involved in the crimes were Andre Collier ("Collier"), Omar Miller ("Miller"), and Rasheed Teel ("Teel"). The victim was Kareem Borowy ("Borowy"). Freeman's alleged role was to drive the other men to Borowy's house and wait in the car while the other men robbed Borowy. However, when confronted at his house, Borowy lied to the other men and told them that he kept his money in a different location. The other men took Borowy outside and forced him into the car, allegedly driven by Freeman. When the car later slowed down, Borowy escaped. Collier chased Borowy and shot him. When he returned to the car, he told Freeman to drive away. Borowy did not survive the shooting.

2

Teel pled guilty to third-degree murder and agreed to testify for the Commonwealth against his co-conspirators. Freeman has categorically denied participating in the crimes and has maintained his innocence from the time he was first interviewed by detectives. Prior to Freeman's trial, the Commonwealth filed notice of its intent to consolidate the cases against Collier, Miller, and Freeman.

### III. DISCUSSION

#### A. Freeman's Bruton Claim

##### 1. Background Information

Miller gave statements to police which confessed to his participation in the robbery and implicated Collier and Freeman as well. Miller did not testify at trial, but his statements were read aloud to the jury. The statements were redacted to replace all references to Collier and Freeman with the phrases "the first guy" and "the second guy," respectively. After the statements were read into evidence, the trial court cautioned the jury that the statements were to be used only as evidence against Miller, not against Collier or Freeman.

##### 2. Admitting Miller's Confession Violated Bruton

The Court agrees with Judge Heffley's determination that admitting Miller's confession violated Bruton, and need not recount her entire analysis. See R. & R. 12-15, ECF No. 37. In summary, the references to Teel's name (which were not redacted

3

since he pled guilty), combined with the fact that Miller's statements referred to himself in first person, precluded the possibility that Teel or Miller were "the first guy" or "the second guy" in Miller's statements. Because there were only two other defendants on trial, a juror "'need only lift [their] eyes to [Collier and Freeman], sitting at counsel table' to determine that [they were] 'the other guy[s]'" involved in the crimes. See Johnson v. Superintendent Fayette SCI, 949 F.3d 791, 797 (3d Cir. 2020) (quoting Gray v. Maryland, 523 U.S. 185, 193 (1998)); see also Williams v. Folino, 625 F. App'x 150, 156 (3d Cir. 2015); Vazquez v. Wilson, 550 F.3d 270, 283 n.14 (3d Cir. 2008). Given that Freeman was clearly inculpated by Miller's statements, his Sixth Amendment confrontation right was violated. See Bruton v. United States, 391 U.S. 123 (1968). The issue then turns to whether that violation constitutes a harmless error. See Johnson, 949 F.3d at 798.

### 3. Harmless Error

In determining whether a Bruton violation is harmless, courts must "assess whether the Bruton error had a 'substantial and injurious effect or influence in determining the jury's verdict'—i.e., if it requires reversal." Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)). Reversal is required if the reviewing court finds that the violation caused the defendant "actual prejudice," which is "more than a reasonable

4

possibility that the error was harmful." Id. at 799 (quoting Davis v. Ayala, 576 U.S. 257, 267-68 (2015)). "Habeas relief must be granted whenever there is 'grave doubt' as to the harmlessness of the error." Id. (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)). In making the determination whether the error was harmless, a reviewing court is to consider five factors:

> the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Id. (alteration in original) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

Here, Judge Heffley found as follows:

> [T]he evidence overwhelmingly suggests that the Bruton violation was harmless. At trial, the Commonwealth presented significant inculpatory evidence against Freeman that corroborated Miller's statement, namely: (1) Teel testified that Freeman participated in the crimes; (2) three witnesses, Amaris Acevedo, Shageata Simmons, and James Reese, testified that Freeman helped to plan and agreed to execute the crimes; (3) cell phone call logs showed that Freeman communicated regularly with Collier during and after the commission of the crimes; and (4) cell-phone tower data indicated that Freeman's movements were consistent with his involvement in the robbery, kidnapping, and murder of Borowy. Thus, even apart from Miller's statement, there was extensive evidence of Freeman's guilt, thereby eliminating any "grave doubt" as to whether the Bruton error had a substantial and injurious effect on the outcome of the trial.

5

R. & R. 16, ECF No. 37 (citations omitted).

It is at best doubtful that the evidence of Freeman's guilt, apart from Miller's statements, "overwhelmingly suggests that the Bruton violation was harmless." See id. On the contrary, a fair amount of the evidence against Freeman permits equally an inference of guilt as it does a more benign explanation.

First, as to the cell-phone tower area data, which recorded that Freeman was in the Pottstown area at the approximate time of the crimes, Joseph Coffman (the corporal who prepared the cell-phone data report) testified that taking into account the range of the data, Freeman could have been up to two miles away from the crimes. Trial Tr. 261-63, Apr. 17, 2014, ECF No. 32-4. Given that Freeman frequented the Pottstown area in question, his presence in the area at the time that the crimes were committed would not have been highly unusual.[1]

---

[1] Freeman admits that he was in the Pottstown area around the time of the crimes, and in fact used that information as part of his alibi defense, which was that he was at a Wawa located at 1520 High Street in Pottstown when the shooting occurred. Video-surveillance footage shows Freeman arriving at Wawa at 2:28 p.m. on the day of the shooting. The time of the shooting cannot be fixed precisely, but it could have happened as early as 2:14 or as late as 2:26 p.m. At trial, the prosecutor offered evidence that Freeman was present at the shooting, dropped off his co-defendants at an apartment on King Street, and then drove to Wawa. Two detectives testified that this approximately 3.5-mile trip would have taken a little over eight minutes, so it was not impossible for Freeman to arrive at Wawa after he was finished participating in the crimes, provided that the shooting occurred at the beginning of the timeline. On the other hand, if the crime occurred toward the end of the timeline, it would not have been physically possible for Freeman to arrive at Wawa at 2:28 p.m., when the video-surveillance footage was taken.

Another piece of cell-phone data is Freeman's call logs, which show several calls made to and received from Collier on the day of the crimes, some of which occurred during the commission of the crimes. Trial Tr. 117-24, Apr. 18, 2014, ECF No. 32-5. This too could give rise to a benign explanation, given that Freeman and Collier were close friends and communicated with each other several times a day on a daily basis.

Second, the next piece of evidence is the testimony of Acevedo, Simmons, and Reese. Judge Heffley found that these three individuals "testified that Freeman helped to plan and agreed to execute the crimes." R. & R. 16, ECF No. 37. Upon close examination, their testimony is not so definitive.

Reese testified that Freeman and the co-defendants were present at his home around lunchtime on the day of the shooting. Reese also testified that he observed Freeman having a conversation with the other co-defendants, but, importantly, he could not hear the entire conversation.[2] Trial Tr. 190-94, Apr. 16, 2014, ECF No. 32-3. In fact, Reese did not testify that he heard Freeman say anything, agree to participate in the crimes,

---

[2]   What Reese did overhear was one of the co-defendants (he could not tell which one) talking about going to Philly to do a "sting" (i.e., robbery). Trial Tr. 190-94, Apr. 16, 2014, ECF No. 32-3. The robbery, however, occurred in Pottstown, which is approximately forty miles from Philadelphia.

7

nod his head, or otherwise make any affirmative gestures.[3] Therefore, it is not correct to conclude that Reese testified that Freeman helped to plan and agreed to execute the crimes.

Acevedo testified she saw Freeman with his co-defendants at Reese's house that day. Again, like Reese, she did not testify that she heard what they were discussing. See id. at 236-42 (Acevedo saw them "[j]ust talking - huddled up, talking"). Additionally, Acevedo's testimony conflicted to some degree with Reese's testimony in that she saw Freeman leaving by himself in his car, while Reese saw all four co-defendants get into Freeman's car and leave together.[4] Id. at 194, 250-51, 254-55. In any case, this testimony does not show that Freeman helped to plan and agreed to execute the crimes.

Finally, Simmons was also at the house on the day of the crimes and testified that she saw the four co-defendants talking

---

[3] It is also worth noting that there are serious credibility issues with Reese's testimony. He initially lied about what happened to the police when interviewed because he "didn't want to be involved," and only came clean afterwards because "[t]hey said I would go to jail." Trial Tr. 196-99, Apr. 16, 2014, ECF No. 32-3. Furthermore, by the time of his testimony he had pled guilty to unrelated forgery charges and was awaiting sentencing. When asked why he chose to testify, he said he was "[j]ust trying to get – I'm just trying to get on with my case, period. I'm tired of sitting in jail." Id. at 198-99.

[4] Acevedo's testimony also contained several inconsistencies between her testimony and the statement she gave to police. She first testified that Freeman drove Miller to the house, id. at 237-38, but then testified that Freeman came by himself, id. at 243. She also first testified that she didn't see him leave (to which defense counsel said "[w]ell, you gave a statement to the police, didn't you?" and she responded "[w]ell, I made a statement so long ago, so I don't remember."), id. at 243-44, but later testified that she saw Freeman leaving and he was the only person in the car, id. at 250-51, 254-55. There were also inconsistencies about the clothing defendants were wearing. See id. at 249-50.

8

at the house for approximately 15-20 minutes during the afternoon, but she did not hear any of the conversation. Id. at 268. As with Reese and Acevedo, this testimony does not show that Freeman helped to plan and agreed to execute the crimes.

The only piece of evidence directly linking Freeman to the crimes (other than Miller's statements) is Teel's testimony. Teel testified that Freeman was the driver throughout the crimes. See id. at 108-42. However, there are significant bias/credibility issues associated with Teel's testimony. Teel testified for the Commonwealth in exchange for a favorable plea bargain to third-degree murder in which he received a significantly reduced sentence instead of a mandatory life sentence in prison. See id. at 164-67. Teel also admitted to lying to the police several times about what happened on the day of the crimes.[5] Furthermore, his testimony was inconsistent with prior statements to the police and that of other individuals. For example, he told the police that Collier was responsible for removing Borowy from his home to the car, but at trial he implicated Miller. See id. at 144-46. As another example, his testimony that he did not carry a gun was inconsistent with the

---

[5] Teel's first statement to the police denied any involvement in the crimes. Id. at 148. In Teel's second statement, he admitted he was lying and then repeated the police's version of the facts to them and said that he and Collier and Freeman committed the crimes, but did not mention Miller. Id. at 153. Then, in Teel's third statement to the police, he again admitted to lying during his second statement, and said that a fourth person was involved. Id. at 155. But Teel intentionally lied again during this third statement about who the fourth person was. Id. at 155-56.

9

testimony of Lewis Scott, another individual present during Borowy's home invasion.[6] See id. at 72-74, 160.

Given the fact that Teel repeatedly lied to police, testified in exchange for a favorable plea bargain, and testified to certain events that were not consistent with previous statements and were contradicted by eyewitnesses, the Miller confession used at trial takes on great significance. During the Commonwealth's closing statement, the prosecutor stated:

> [Teel] was consistent, because that was the truth. And you don't have to just take his word for it. Look at all the different ways that he was corroborated. . . . In [Miller's] statement, at the robbery planning session that he was there for, he said they were talking about a mission. Small. Yes, very small. But so powerful. Rasheed Teel said it was called a mission, so did Omar Miller.

Trial Tr. 147-48, Apr. 21, 2014, ECF No. 33 (emphasis added).

The Court's conclusion in this case that the Bruton error is not harmless is guided by Third Circuit precedent. See Washington v. Sec'y Pa. Dep't of Corr., 801 F.3d 160, 171 (3d Cir. 2015); see also Vazquez v. Wilson, 550 F.3d

---

[6]    A. My bedroom door swung open, and there was two guys came in there, brandishing handguns.
    Q. What color did the guns look like?
    A. I seen – one was black and I seen one that was silver. . . .
    Q. And when the door swung open, you saw these two guys with guns, did they say anything to you?
    A. Yes. One of them said, what's up, bro.
Id. at 72-73.

270, 282-83 (3d Cir. 2008) (finding a Bruton error not harmless despite "fingerprint evidence point[ing] to Vazquez as the shooter," "repeated attempts to flee police," and comments to a witness "that the crime should have been covered up"); Brown v. Superintendent Greene SCI, 834 F.3d 506, 520-22 (3d Cir. 2016) (Bruton violation was "substantial and injurious" even though an acquaintance of the defendant testified to the defendant's role in the murder and robbery because the acquaintance had "substantial flaws as a witness").

Washington involved a prosecution for robbery and murder. See 801 F.3d at 162-63. Remarkably similar to this case, the Bruton violation in Washington involved "the admission into evidence of a confession by a non-testifying codefendant that redacted [Defendant's] name and replaced it with the generic terms describing [Defendant] and his role in the charged crimes." Id. at 162. Like Freeman, Washington also suffered from conflicting evidence in relation to his alibi defense. Id. at 171.

Ultimately, the Third Circuit in Washington found that the Bruton violation was not harmless error because "the only significant evidence . . . came from [a co-defendant's] testimony," which suffered from "significant credibility problems, because of [the co-defendant's]

11

history of drug and alcohol abuse, as well as [his] inherent incentive to minimize his own culpability as a participant in the events he described." Id. Here, as in Washington, the only significant evidence linking the Defendant to the crimes was the testimony of a co-defendant. See id. Also as in Washington, the testimony of the co-defendant (Teel) suffered from significant credibility problems. See id. In this case, Teel had an incentive to testify against Freeman in exchange for a favorable plea bargain and he repeatedly lied to police about who was actually involved in the crimes. See supra Section III.A.3. n.5.

The Third Circuit recently clarified that a reviewing court "need not be certain that a Bruton error affected the jury." Johnson v. Superintendent Fayette SCI, 949 F.3d 791, 799 (3d Cir. 2020). In doing so, the Third Circuit noted the "'impossibility' of such a determination." Id. (quoting Bruton, 391 U.S. at 135). Additionally, if the matter is "so evenly balanced" that the court is in "virtual equipoise as to the harmlessness of the error," the reviewing court must resolve the balance in favor of the petitioner. See O'Neil v. McAnich, 513 U.S. 432, 435, 437 (U.S. 1995). In these circumstances, "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had

a 'substantial and injurious effect or influence in determining the jury's verdict')". Id. at 435.

In this case, there is "more than a reasonable possibility that the error was harmful." Johnson, 949 F.3d at 799 (quoting Davis v. Ayala, 576 U.S. 257, 267-68 (2015)). Although the Court cannot say with certainty that the Bruton error here "affected the jury," see id., it can say that there is more than a reasonable possibility that it did. At the end of the day, the main pieces of evidence that the prosecution had to offer against Freeman[7] were one direct piece of evidence that was riddled with credibility issues (Teel's testimony), the testimony of three witnesses who admitted they did not hear Freeman discuss the planning and execution of the crimes with his co-defendants, and weak circumstantial cell-phone evidence. Viewed together, this evidence is consistent with both guilt and the absence of guilt. Under these circumstances, the Court believes that the prosecutor's [Bruton] violation had a "substantial and injurious effect," see id. at 798 (quoting Brecht, 507 U.S. at 638) and that relief is therefore warranted.

**IV. CONCLUSION**

---

[7] There were other, smaller, pieces of evidence, such as the fact that Freeman threw his cell phones into the garbage before going to the police station to speak with detectives, see R. & R. 3, ECF No. 37, but Judge Heffley did not consider these in her Bruton analysis, and in any case, such circumstantial evidence would not change the outcome of this Court's opinion.

13

As a result of the foregoing, the Court declines to adopt Judge Heffley's Report and Recommendation and will grant Freeman's habeas petition. The Court need not consider Freeman's other arguments or objections as they are now moot. The Commonwealth of Pennsylvania shall either release or retry Freeman within 120 days of entry of this memorandum.[8] An appropriate order follows.

---

[8] In the event that Freeman is not retried within 120 days, the "release or retry" language above "d[oes] not prohibit the Commonwealth from re-arresting and retrying [Freeman] after his release on the original charges, and detaining him pending that retrial, subject to [Freeman's] right to a pretrial bail hearing and any other rights of the accused under state and federal law." See Washington v. Beard, 258 F. Supp. 3d 512, 517 (E.D. Pa. 2017) (Robreno, J.). Whether Freeman should be released on bail if the Commonwealth choses to retry him pending trial is an issue for the state court of competent jurisdiction to determine.

14